# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### MIDDLE DIVISION

04 AUG 26 PM 3: 26

. . . . STRICT COURT
N.D. OF ALABAMA

| | | |
|---|---|---|
| ROY WILLIAMS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. CV-03-PT-3305-M |
| | ) | |
| YACHIYO MANUFACTURING OF | ) | |
| ALABAMA, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

ENTERED
AUG 2 6 2004

## MEMORANDUM OPINION

This cause comes on to be heard upon defendant Yachiyo Manufacturing of Alabama, LLC's

(YMA) motion for summary judgment filed on June 14, 2004.

### FACTS & PROCEDURAL HISTORY[1]

---

[1] In response to defendant's motion for summary judgment, plaintiff filed a personal affidavit with attached exhibits on July 21, 2004. On July 30, 2004, defendant filed a motion to strike portions of plaintiff's affidavit. The individual objections to particular statements from the affidavit will be discussed throughout the following statement of facts. Defendant gave the following grounds for its motion to strike:

(1) Evidence containing hearsay is inadmissible. *See Macuba v. Deboer*, 193 F.3d 1316, 1322-23 (11th Cir. 1999); *Pritchard v. Southern Co. Services*, 92 F.3d 1130, 1135 (11th Cir. 1996); *Powers v. CSX Transp., Inc.*, 97 F.Supp.2d 1297, 1298 n.1 (S.D. Ala. 2000) (granting defendant's motion to strike unauthenticated documents containing hearsay).

(2) Conclusory evidence is inadmissible. *See Evers v. General Motors Corporation*, 770 F.2d 984, 986 (11th Cir. 1985) (stating that affidavits in opposition to a motion for summary judgment which contain conclusory allegations without specific acts to support such allegations have no probative value); *Story v. Sunshine Foliage World, Inc.*, 120 F.Supp.2d 1027, 1030 (M.D. Fla. 2000)(mandating that affidavits containing conclusory arguments unsupported by specific facts or those not based on personal knowledge are due to be stricken).

(3) Evidence that contradicts prior sworn testimony is inadmissible. *See Van T. Junkins v. U.S. Industries, Inc.*, 736 F.2d 656 (11th Cir. 1983).

*33*

I.    **Plaintiff's Employment at Yachiyo Manufacturing of Alabama.**

Defendant YMA is a motor vehicle manufacturing parts supplier located in Steele,

Alabama.  Production processes include welding of frame assembly components for Honda's

Odyssey minivan and Pilot sport utility vehicle.

Plaintiff Williams is an African-American male.  Williams was employed as a temporary

employee for First Choice assigned to YMA beginning in August or September 2002.[2]  On

January 6, 2003, Williams was hired as a full-time production welder by YMA.  All YMA

employees are called associates, and production welder is an hourly associate position.  Williams

worked exclusively on the second shift in the welding department on the fuel tank band process.

II.   **Plaintiff's Allegations Regarding YMA's Alleged Denial of Light Duty Work.**

---

(4)  Testimony that lacks personal knowledge, foundation or is lay opinion testimony
without foundation is inadmissible.  *See KW Plastics v. United States Can Co.,* 131 F.Supp.2d
1265, 1272 (M.D. Ala. 2001).

(5)  Documents lacking proper authentication are inadmissible under Fed. R. Evid. 901.
*See Williams v. Eckerd Family Youth Alternative,* 908 F.Supp. 908, 911 (M.D. Fla. 1995)
(stating that "[t]his Court recognizes that for a document to be considered in support or in
opposition to a motion for summary judgment, it must be authenticated by an affidavit that meets
the requirements of the summary judgment rule"); *White v. Wells Fargo Guard Services,* 908
F.Supp. 1570, 1579 (M.D. Ala. 1995); *Burnett v. Stagner Hotel Courts, Inc.,* 821 F.Supp. 678,
683 (N.D. Ga. 1993), aff'd 42 F.3d 645 (11th Cir. 1994) (declining to consider a document
attached to plaintiff's opposition brief which was not attached to an affidavit, certified, or
otherwise authenticated).

(6)  Documents that do not constitute the best evidence are inadmissible.  *See* Fed. R.
Evid. 1001.

(7)  Documents that are irrelevant and/or immaterial under Federal Rule of Evidence 401
are inadmissible.

[2] Plaintiff's affidavit testimony states that he began at YMA as a temporary employee on
August 12, 2002.  However, defendant states in its brief in support of its motion for summary
judgment that plaintiff began working at YMA in September 2002.

2

Williams claims to have suffered an injury to his left thumb sometime in May, 2003. Thereafter, Williams asserts, YMA twice refused to assign him light duty when he was put on light duty restriction by his doctors. These denials of light duty by YMA allegedly occurred from May 28, 2003 to July 8, 2003, and from August 21, 2003 to December 31, 2003.

According to YMA, in early June 2003, YMA's Production Coordinator Scott Shannon questioned Williams regarding his low production on the fuel tank band machine. Williams responded that his thumb was bothering him, and Shannon told him that he should go to the doctor. Williams told Shannon that he had already been to the doctor and that the doctor had told him that he should only perform light duty work. YMA claims that on or after June 2, 2003, Williams brought a doctor's note dated June 2, 2003, which restricted Williams from lifting more than ten pounds with his left arm and from pushing or pulling more than ten pounds with his left arm. The note also directed Williams to use a splint while working and restricted him from forceful pushing and pulling with his left thumb. Williams also presented to Shannon a doctor's note dated May 27, 2003, which YMA claims had not previously been presented to it.

In contrast to YMA's claims that Williams did not supply it with any doctors notes before June 2, 2003, Williams claims he gave Janet Aklout, YMA's associate services director, a light duty slip from Dr. M. Morris on May 28, 2003. This slip which is dated May 27, 2003 required Williams's lifting be restricted to five (5) pounds and that he have "no use of [his] left hand." Williams claims he was instructed to turn in such doctor's slips to Aklout,[3] and that,

---

[3] Defendant moves to strike plaintiff's statement that he was instructed to give such return to work slips to Aklout (spelled Al-kahlout by defendant). Defendant claims that plaintiff lacks the requisite foundation to offer this testimony. Because plaintiff does not state who instructed him to give the doctor's note to Aklout/Al-kahlout, defendant argues that plaintiff has not shown personal knowledge that he was supposed to give the note to Aklout/Al-kahlout.

contrary to Shannon's affidavit testimony, Williams was not required to give such slips to

Shannon.  According to Williams, Shannon was not his supervisor in May and June 2003.[4]

---

In his affidavit, plaintiff also stated, "Ms. Aklout did not give an affidavit."  Defendant argues that this statement should be stricken because plaintiff lacks foundation to testify as to what Aklout/Al-kahlout gave.

[4] Defendant argues that plaintiff's testimony that he "was not required to give the return to work slip to Scott Shannon" should be stricken as conclusory testimony.  Defendant argues that this statement is conclusory because plaintiff did not describe why he did not have to give the note to Shannon.  Defendant further asserts that this statement should be stricken because it contradicts plaintiff's prior deposition testimony.  Additionally, defendant asserts that plaintiff's affidavit testimony that "Scott Shannon was not my supervisor" and that "I would not have turned my May 28, 2003 work return slip to Scott Shannon" should be stricken because they contradict plaintiff's prior deposition testimony.  As proof of the contradiction, defendant points to plaintiff's following deposition testimony:

Q:   Now I asked you who at YMA denied your light duty work.  Who did it to you?
A:   Shannon - it was the team leader.
Q:   Who?
A:   . . . . oh, its Scott Shannon, Scott Shannon. . . .
Q:   It's your testimony that Scott Shannon denied you light duty work?
A:   Yes sir

(Williams depo. I, p. 293, l. 14 - p. 294, l. 2).

Q:   So on June 2nd, '03, it's your testimony you were denied light duty work -
A:   Yes, sir.
Q:   - by Scott Shannon?
A:   Right
Q:   Tell me what happened.
A:   They kept me on the machine doing the same thing.  That's what I was trying to tell you.

(Williams depo. I, p. 295, ll. 15-23).

Q:   And one of the supervisors explained to you how to operate your machine without your thumb; do you remember that?
A:   Right.
Q:   Who was that, that showed you how to operate -
A:   Scott Shannon.

(Williams depo. I, p. 299, l. 23 - p. 300, l. 6).

4

Williams states that despite turning in the work slip on May 28, 2003, he was not awarded light duty until after he had filed an EEOC charge on July 1, 2003.[5]

On or after June 19, 2003, Williams presented YMA with another doctor's note, which required that Williams wear a splint and refrain from forceful pushing with his left thumb. Another doctor's note dated July 8, 2003 required Williams to wear a thumb splint and to refrain from lifting and from flexing or extending his left thumb.

YMA claims that it is its policy to provide available light duty work for employees who have been injured on the job and who present YMA with satisfactory medical documentation of their need for light duty work. After Williams presented Shannon with the first two doctor's notes, Shannon assigned him to continue operating the same machine that Williams had previously been operating. According to YMA, operating the fuel tank band machine is one of the least strenuous jobs at YMA.[6] The fuel tank band machine requires less than five (5) pounds of lifting to operate, and does not require use of either thumb by its operator. YMA points out that white employees, such as Vicki Edmondson, have been assigned to machines similar to the fuel tank band machine after being injured. After Shannon first received the doctor's notes from

---

[5] Defendant points out that, in his deposition testimony, Williams estimated that he was granted three to four months of light duty work in 2003. (Williams depo. p. 304). Defendant also highlights Williams's testimony that the only reason he believed that race was the motive for his being denied light duty work was the fact that he is black (Williams depo. p. 301).

Additionally, defendant moves to strike plaintiff's statement that he was not granted light duty until after he filed his EEOC charge. Defendant claims this is a conclusory statement and that it contradicts record evidence and plaintiff's testimony that Shannon instructed him how to operate his machine without his thumbs. (Williams depo. I, p. 299, l. 23 - p. 300, l. 6).

[6] Defendant cites to "Carpenter aff., 3" to support this assertion. However, the court notes that this paragraph does not address operation of the fuel tank band machine.

Williams, he demonstrated to Williams how to operate the fuel tank band machine without using his thumbs. Shannon testified in an affidavit that, despite this instruction, Williams's production numbers did not improve.

YMA asserts that in early July 2003, Assistant Production Manager Mike Charlebois attempted to find other light duty work for Williams. After Williams claimed that general cleaning and sedentary clipping hoses work hurt his hand, Charlebois assigned Williams to sweeping floors with a push broom or a mechanical sweeper. These sweeping assignments continued until Williams had surgery on his left thumb in late July or August 2003. Following the surgery, Shannon assigned Williams to a welding machine called a stationary spot welder, which is operated by foot pedals. Williams also continued sweeping floors following his surgery.

According to Williams, on August 21, 2003 his doctor, Dr. Kelley, recommended that he be given sedentary work. This recommendation was contained on a slip dated August 21, 2003 and signed by Dr. Kelley. Despite this note, Williams contends, after this date he was asked to clean pipes and sweep, neither of which, he notes, is sedentary work.[7] Williams has produced another slip from Dr. Kelly dated October 24, 2003 also recommending that he only do sedentary work. Finally, in a slip dated December 5, 2003, Dr. Kelly indicated that Williams could return to work using a foot pedal.

In his affidavit testimony, Williams did not indicate when and to whom at YMA he gave the two doctor's slips requiring that he perform only sedentary work. YMA highlights Williams

---

[7] In his affidavit, plaintiff asserts, "None of the affidavits submitted by YMA indicated that I was ever given sedentary work." Defendant moves to strike this statement because plaintiff has not offered the best evidence of the affidavits.

deposition testimony in which he stated that he submitted the doctor's note/s requiring sedentary work to "Tony and them." (Williams Depo. p. 186, ll. 12-23). YMA maintains that Williams was referring to Tony Wojciechowski, a YMA associate services manager, who did not begin work at YMA until November 2003. YMA asserts that, even if Williams had submitted such notes, he would not have been able to perform sedentary light duty work because no sedentary light duty work was available for Williams within his doctors restrictions that did not hurt his thumb. However, Williams contends in his affidavit, if no sedentary work was available, he should have been sent home to receive temporary-total disability workers compensation benefits.[8] Instead, Williams claims he was required to clean and sweep, activities that continued to stress and injure his hand.

Williams alleges that Vicki Edmondson, a white production associate who injured her arm, shoulder, and back in March, 2003, received better treatment than he when she was restricted to light duty because she was allowed to perform sedentary work.[9] In January 2004, Edmondson returned to work after rotator cuff surgery and was restricted from using her entire left arm. She was assigned to light duty computer work. Edmondson had two years of college training with computers and five years of on-the-job experience. YMA asserts that Williams

---

[8] Defendant moves to strike this statement from plaintiff's affidavit as conclusory and as inadmissible, lay opinion testimony. Defendant maintains that plaintiff has not offered any facts upon which he bases this opinion.

[9] In his affidavit, plaintiff states, "I was denied the opportunity to work on the computer, as did Vickie Edmondson, a white female, who was similarly situated production associate, who suffered a similar injury as I." Defendant moves to strike this assertion as a conclusory statement to which plaintiff lacks foundation to testify. Defendant argues that plaintiff offers no facts as to why they are similarly situated and does not have personal knowledge or facts of Ms. Edmondson's injury.

indicated that he had no computer skills and nothing he submitted to the company suggested

otherwise.  However, in his affidavit, Williams claims that his application for employment at

YMA indicated that he had computer skills, which he had learned in college and from working in

"personal" (*sic*) while in the U.S. Army.[10]  After Edmondson worked 30 days on light computer

duty, she was sent home because no more light duty work was available within her restrictions.[11]

In total in 2003, Williams worked on what YMA asserts was light restricted duty for 120 days

and missed 26 days of work because of his injuries.[12]

### III.   Plaintiff's Allegations Regarding Denial of the Opportunity to Work Overtime.

Prior to June, 2003, Williams testified, he averaged 15 to 22 hours of overtime per week.

However, in June 2003, Williams claims, he was denied the ability to work overtime and that a

white employee, Tina Patterson, was allowed to work overtime in his place.[13]  In his deposition,

Williams testified that Patterson was allowed to work overtime on his process, the fuel tank band

machine, every time the opportunity was available during the relevant time.  In his affidavit

---

[10] Defendant argues that this statement should be stricken from plaintiff's affidavit because he has not offered the "best evidence" of his application.  Defendant contends that because plaintiff has not submitted his application into evidence, his testimony as to its contents is inadmissible.

[11] Defendant points out that, in contrast to Edmondson's 30 days of light duty, plaintiff admitted in his deposition that he received two to four months of light duty work at YMA in 2003.

[12] YMA claims that it grants light duty work to all associates regardless of their race.  According to YMA, African Americans who have worked light duty within their doctor's restrictions include: Roy Williams, the plaintiff here, Belinda Looney, LaTonya Kimble, Lovell Stewart, Raymond Kelly, and Lisa Hale.

[13] In his affidavit, plaintiff states, "Tina Patterson worked the overtime."  Defendant moves to strike this assertion by claiming that plaintiff lacks the requisite foundation to testify as to what Patterson did.  Defendant argues that plaintiff lacks personal knowledge as to whether Patterson worked the overtime or not.

testimony, Williams claimed he was denied the opportunity to work overtime in favor of Patterson on June 17, 2003, June 18, 2003 and June 20, 2003.  In his deposition, Williams estimated that he was similarly prevented from working overtime approximately ten to fifteen additional times during June 2003.  Williams also stated that he believes Patterson was given the overtime at his machine because she is white and he is black.  Williams claims that he should have been allowed to work overtime despite the fact that he was on light duty.

In his deposition, Williams admitted that YMA's Associate Handbook was applicable throughout his employment with the company.  YMA's overtime policy, as stated in the Associate Handbook, reads as follows:

> It is the intention of YMA to schedule production so that overtime will be unnecessary or kept to a minimum level. . . . When short-term daily overtime is required, those who normally perform the work, or who are doing the work at the end of the shift will be given the opportunity to finish the work. . . . YMA will use its best efforts to distribute overtime as equally as practicable among those in the department who are capable and trained in performing the work.

YMA asserts that, "except in unusual circumstances, employees on light duty restrictions are not required or permitted to perform overtime work."[14]  YMA admits that when Williams was on light duty restriction, which lasted for much of 2003, he was not allowed to work overtime except in unusual circumstances.  According to YMA, overtime is needed when

---

[14] Defendant points out that when Edmondson was on light duty, she only worked 30 minutes of overtime as make-up work.  However, the court notes that, in his deposition, Williams testified that it was typical for employees on light duty to work overtime.  (Williams depo. p. 187).

production is not sufficient during regular work hours and, in most circumstances, an employee working on a process will be asked to perform overtime work on that process if overtime is needed. After Williams injured his thumb, YMA claims his low productivity caused production on the fuel tank band to fall substantially behind. Although Williams was on light duty restrictions, he was still operating the fuel tank band machine, because, according to Shannon, such work was within his doctor's restrictions. Williams claims that because he was already working on the fuel tank band machine on the days in question, he was capable of performing the overtime and, therefore, should have been assigned it under the YMA's overtime policy. Williams also contests YMA's claim that his productivity was low at this time,[15] and its claim of a policy prohibiting overtime to persons who are on light duty.[16] According to YMA, on June 10, 2003, Patterson, who came to YMA as a temporary employee, was assigned to the fuel tank band because production on that machine was behind schedule.[17] In her affidavit, Patterson

---

[15] Plaintiff points out that YMA has not produced any records to show that his production was down in June 2003.

[16] In his affidavit, plaintiff states, "YMA complains that I was not fit to perform overtime." Defendant asserts that plaintiff's statement is not the best evidence of YMA's argument and is not an accurate depiction of the argument, and therefore should be stricken.

Plaintiff also states in his affidavit, "If YMA felt that I was not capable of working on the fuel tank machine in June 2003, it should have put me on light duty." Defendant claims that this statement is conclusory and inadmissible lay person opinion testimony. Defendant further argues that plaintiff lacks the requisite foundation to testify to what YMA should have done. For these reasons, defendant concludes this statement should be stricken from plaintiff's affidavit.

Defendant also disputes the admissibility of plaintiff's affidavit testimony that, "YMA has no policy that prohibits overtime to persons who are on light duty." Defendant argues that this assertion should be stricken because plaintiff fails to state what facts he basis his opinion on and therefore lacks the requisite foundation to make this statement.

[17] Defendant points out that temporary associates are occasionally employed to assist processes at YMA which have fallen behind.

10

acknowledged working overtime on Saturday June 21, 2003 on the fuel tank band machine.[18]

Williams testified that every white employee at the YMA plant was treated better than he was with respect to overtime.[19]  However, Williams did admit that he knew of at least four African American employees who worked overtime in 2003: Tommy Sutton, Erskine Fears, Raymond Kelley, and Willie McCloud.  YMA states that, despite being on light duty for approximately four months and off work for at least one month, plaintiff worked more than 200 hours of overtime in 2003.  YMA points out that Williams overtime hours and those of other African American employees at YMA are comparable to the amount of overtime hours given to its white employees.  YMA indicates that Tommy Sutton worked 378.61 overtime hours and Raymond Kelley worked 260.38 overtime hours in 2003.  Some of YMA's white employees include Beth Hyatt, who worked 166 overtime hours in 2003, Kim McClain, who worked 312.24 hours, Cody Mayo, who worked 285.17 hours, and DeWayne Hardy, who worked 273.67 hours.

## IV.   Plaintiff's Allegations Regarding Failure to Promote to Quality Assurance Position.

In May 2003, a quality assurance position became available at YMA and was posted on the bulletin board.  YMA maintains this position was an hourly associate position and did not pay any more than Williams hourly production associate position.  YMA asserts that a move from a production associate position to a quality assurance position at YMA is a lateral transfer only.  According to YMA, for an associate to be eligible to transfer to another associate position,

---

[18] Defendant indicates that, because Patterson had to work overtime on that Saturday, her team leader, Danita Smith, an African American female, also had to work overtime while Patterson was at the plant on that day.

[19] Defendant draws attention to Williams's deposition testimony that the only reason he believes he was discriminated against with regard to his overtime opportunities is because he is black and white employees worked overtime.

the associate must satisfy all the requirements of the Transfer Policy contained in YMA's

Associate Handbook.  Until January 2004,[20] the transfer policy stated that an associate would be

eligible for a voluntary transfer if the associate:

- Has completed a "Department Transfer Request" form.

- Has skill and ability to perform the work.

- Has 12 months of company service.

- Has been in current department for the past 12 months, i.e. (one voluntary transfer per year).

- Has had no counseling for the past 12 months.

Once the YMA Associate Service Department has collected all the Department Transfer

Requests from associates interested in the voluntary transfer, the Associate Services

Manager/Coordinator and Plant Manager Carpenter evaluate the applicants to determine if each

of them is eligible to apply for the position.  For a quality assurance position, the eligible

applicants are then able to take a quality assurance test/interview.  The quality assurance test is

an hour and forty-five minute test involving a mathematical test, a gauging and equipment test, a

computer skills and knowledge test, and an interview.  After the applicants take the test, the

results are evaluated to determine if any of the applicants are qualified for the position.  If there

are qualified applicants, the Plant Manger decides who will be awarded the position.  If no

qualified applicants exist pursuant to the transfer policy, YMA then seeks to hire a new associate

to fill the position.

---

[20]  In January 2004, Plant Manager Randy Carpenter announced a modification of the transfer policy to require only six (6) months of company service, six (6) months in the same department, and six (6) months with no counseling.

In May 2003, following the quality assurance test and interview, none of the applicants who were still eligible for the position had performed sufficiently on the test/interview to be considered qualified for the position.[21]   Therefore, Jonathan Collum was hired from outside the plant pursuant to company policy.[22]   Carpenter made the decision to hire Collum with input from Tony Scerba, the Quality Assurance Coordinator.

YMA claims that Williams was not considered for this position because the company did not have a record of his submitting a Department Transfer Request form.   Williams, on the other hand, asserts that he did submit a Department Transfer Request and that he was denied the opportunity to take the quality assurance test/interview.   YMA maintains that, even if Williams had submitted a Department Transfer Request, he nevertheless would not have been eligible to take the quality assurance test/interview or be considered for the position because he only had approximately four months of company service at the time the position became available.   YMA asserts that the company's then current transfer policy required that an associate have 12-months company service before applying for a transfer position.[23]   YMA states that none of its associates with less than the amount of company service required by the transfer policy have been allowed

_____

[21] Don Whaley had applied for the position while working at YMA as a temporary associate.  He performed well enough on the test/interview to be qualified for the position. However, at the time it was offered, he was not eligible for the position because he had accepted a regular production associate position and he did not have 12 months company service to satisfy the transfer policy.

[22] Defendant states in its brief that, at the time the job was awarded, Collum was actually paid less than Williams was paid in his position.  However, the court notes that the citation given for this proposition (Carpenter aff., ¶ 7) does not mention Collum's rate of pay.

[23] Defendant contends that, even under the transfer policy as amended in January 2004, Williams would still not have qualified for the position because he had only four months of company service instead of the required six months.

13

to transfer.[24]

Williams disputes that YMA followed the rule requiring associates to have 12 months of

company service before transferring to another position. Williams claims that Nina Hibbs, a

Caucasian, was not an associate for 12 months when she received a transfer from production to

QA on July 22, 2002.[25] Additionally, Williams that asserts Beth Hayatt, a white female who was

employed with YMA in September 2002 in the assembly department, transferred to the weld

department around January 2003, less than 12 months after her hiring date.[26] Finally Williams

states that he was better qualified for the QA position than Collum, who had no experience in

QA. Williams claims he has 3 ½ years of QA experience with Tyson Foods, Inc.[27]

## V.   Plaintiff's Allegations of Racial Harassment.[28]

Williams maintains that on three or four occasions in May or June, 2004 another hourly

associate, Don Whaley, called him a "nigger." As contained in YMA's Associate's Handbook,

---

[24] YMA contends that promotions are not governed by the transfer policy requirements. In November 2002, Jeremy Beard was promoted to team leading in his department although he had less than one year of company service. As this was a promotion, YMA argues, the voluntary transfer requirements did not apply to this change of position.

[25] Plaintiff points to defendant's supplemental responses to plaintiff's Interrogatories and Request for Production. In answer to interrogatory number 20, defendant indicated that Hibbs was transferred from production associate to QA associate on July 22, 2002. Defendant also produced a wage report regarding Hibbs which indicates that her date of hire was November 12, 2001, less then 12 months before the July 22 transfer.

[26] Plaintiff relies on Hayatt's affidavit (def.'s ex. 18) as his basis for this assertion.

[27] Defendant moves to strike plaintiff's affidavit testimony that Collum "had no experience in QA, and as [plaintiff's] application to YMA showed, [plaintiff] had 3 ½ years of QA experience with Tyson Foods." Defendant maintains that plaintiff lacked the requisite foundation to testify regarding Collum's experience. Additionally, defendant argues that plaintiff's testimony regarding his application is not the best evidence of the application.

[28] Williams did not address the harassment claims in his affidavit testimony.

14

YMA's Harassment Policy states:

> All associates have the right to work in an environment free from harassment. . . .
> YMA will not tolerate the harassment of its associates, whether by other
> associates or by non-associates.  It is your responsibility to report any form of
> harassment that you experienced or witness immediately to your supervisor or
> directly to the Associate Service Coordinator or the Administrative Manager.
> YMA will take appropriate and effective action in a timely and confidential
> manner. . . . No associate shall suffer retaliation because of a good faith report of
> harassment or because of good faith statements made during the course of
> investigation of harassment.

According to YMA, all YMA associates are provided with a copy of the handbook, and the
harassment policy is vigorously enforced.[29]  YMA highlights Williams's deposition testimony
admitting that he is aware that the harassment policy in the handbook has been in effect
throughout his employment.  Williams also stated that, although he knew he could have reported
the alleged harassing statements by Whaley and that he knew who to report them to, he did not
report any of them to YMA management.

Williams claims that the first two times Whaley used the slur, he said it in such a way
that only Williams could hear it.  Williams contends that the third time Whaley used the slur,
Whaley got off the forklift he was driving and stated loudly to Williams, "Nigger, I'm tired of

---

[29] Raymond Kelley, an African American production associate, testified that he once
heard a white employee named Jesse use the "N" word at work.  Kelley stated that he reported
the statement to the Human Resources Department and YMA responded immediately and
remedied the situation.

you." According to Williams, two YMA female employees, Tammy Hoskins and Lindsay Davenport,[30] overheard Whaley's third use of the slur and reported it to Craig Scott, the production coordinator. Although Williams did not hear them report the alleged harassment to Scott, Williams claims the two women entered Scott's office and Scott soon ran out of his office and approached Williams. Williams stated that Scott told him: "Don't do nothing wrong. Don't start no fight. Don't fight in here. We'll take care of it."

In contrast to Williams's version of events, Tammy Hoskins testified that she did not hear Mr. Whaley or anyone else use the slur "nigger" directed at Williams or any other YMA employee. Hoskins stated that she recalled an incident where Whaley became angry with Williams when Williams was asking Whaley for some bins, but she did not hear Whaley use the slur, "nigger," during this incident.[31] Hoskins stated that she never reported to Williams, Scott, or anyone else that Whaley made a racial remark or directed a racial slur against Williams. Similarly, Scott testified that no one ever reported to him that Don Whaley had used the slur, "nigger," or directed any other racial remark toward Williams or any other YMA employee.[32]

_____

[30] Defendant claims that YMA has never had an employee named "Lindsay Davenport." However, the court notes that the cite given for this assertion (Wojciechowski aff., ¶ 15) does not mention the non-existence of such an employee. Additionally, in his deposition testimony, Williams identified the second woman as "Lindsay something," and defendant's counsel supplied the last name "Davenport" to which William agreed. (Williams Depo., p. 242, ll. 5-8). The court also notes that in relation to this incident Scott testified, "Neither Tammy Hoskins or Lindsay *Sherpa* ever reported to me any racial harassment or use of the slur, 'nigger.'" (Scott aff., ¶4) (emphasis added).

[31]Hoskins also noted that Whaley often got angry with white employees, including herself.

[32] Scott also asserted that he has never heard anyone at YMA use the slur, "nigger," but that he knew Dan Crawford, a former YMA material control coordinator, was terminated for using that slur on one occasion.

Williams also testified that following this incident, Whaley called him a "nigger" a fourth time. However Williams did not report this incident to management and does not know whether or not anyone in management was aware of the alleged incident.

According to YMA, numerous YMA employees, including those whom Williams claimed in his discovery responses had hearsay information to support his claims, have testified that they have never witnessed any racial discrimination or harassment directed towards Williams.

## VI. **Procedural History**

On July 1, 2003, Williams filed an EEOC charge of discrimination, alleging race discrimination.[33] Williams filed the present action on December 15, 2003. The complaint[34]

---

[33] The EEOC charge alleged that the earliest date of discrimination was 5/28/03. It further alleged:

> [I] was first started to working (*sic*) as a temporary employee and I was hired as a full time employee on January 6, 2003, as a production welder. Since the start of my employment and continuing I have been subjected to harassment, intimidation and different terms/conditions of employment. I have been denied overtime, promotions and light duty as requested by my doctor. On May 28, 2003, I presented my employer with a medical excuse requesting that I be assigned to a light duty job position. As of July 1, 2003, my employer has not provided me with light duty.
>
> The employer has not proffered, told, or given me any reason as to why I am being subjected to adverse conditions of employment.
>
> I believe that I am being discriminated against because of my race, Black, in violation of Title VII of the Civil Rights Act of 1964, as amended. White employees are treated more favorably in the work environment and they are afforded overtime upon request, to include but not limited to granting light duty to all White employees that request it.

[34] Williams asked and was granted leave of this court to amend his complaint. The amended complaint was filed on April 21, 2004. However, pursuant to a May 4, 2004 Order of

17

contained the following counts: Count One (Racial Discrimination in Terms and Conditions of

Employment)[35]; Count Two (Racial Discrimination – Failure to Promote)[36]; and Count Three

(Racial Harassment).[37]

## SUMMARY JUDGMENT STANDARD

Summary judgment may be granted based upon facts developed through pleadings,

discovery, and supplemental affidavits, etc., if together, they show that there is no genuine issue

---

this court, any new claims raised in plaintiff's amended complaint are severed for purposes of this litigation. Therefore, here the court considers only those issues raised in Williams's original complaint. Williams's original complaint requested: (1) a declaratory judgment holding that YMA engaged in employment discrimination against Williams; (2) a permanent injunction enjoining YMA from engaging in future acts of employment discrimination; and (3) "back pay, front pay, lost benefits, other compensatory damages (including mental anguish damages), punitive damages, costs, attorney fees and expenses."

[35] Count One alleged: "On account of plaintiff's race defendant discriminated against them (*sic*) with respect to promotions, job assignments, discipline, and other terms and conditions of employment. Plaintiff avers that on or about May 28, 2003, he presented defendant with a medical excuse requesting that he be assigned to a light duty job position. Plaintiff avers that defendant has not provided him with light duty work. Plaintiff avers that white employees who are hurt on the job are given light duty assignments. Plaintiff avers that race was a factor in defendants (*sic*) decision not to award him light duty and that he would have been awarded a light duty job position but for said race discrimination."

[36] Count Two alleged: "Plaintiff avers that defendant discriminates against African-American (*sic*) in its promotions policies and carries out this policy by failing to post positions for which African-American (*sic*) would apply. In or about May 2003, plaintiff applied for and was denied a Quality assurance position which was awarded to a white employee with less qualifications. Plaintiff avers that defendant discriminates against African-Americans in the assignment of positions by assigning blacks to more menial and less desirable positions. This practice is demonstrated by inordinately assigning blacks to lower rank jobs and not promoting blacks to administrative and supervisory positions. Plaintiff avers that defendant discriminates based on race when administering its wage policies and practices. Plaintiff avers that he and black employees are awarded less overtime than similarly situated white employees."

[37] Count Three alleges: "Plaintiff, Williams, claims that he was harassed on account of his race. Defendant has allowed plaintiff's co-worker to use racial epithets when addressing plaintiff without disciplining said co-worker."

18

as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party moving for summary judgment bears the initial burden of explaining the basis of his motion. *Celotex*, 477 U.S. at 323. "It is never enough [for the movant] simply to state that the non-moving party could not meet their burden at trial." *Mullins v. Crowell*, 228 F.3d 1305, 1313 (11th Cir. 2000) (quotation omitted). The non-moving party then bears the burden of pointing to specific facts demonstrating that there is a genuine issue of fact for trial. *Celotex*, 477 U.S. at 324. The non-moving party "must either point to evidence in the record or present additional evidence 'sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.'" *Hammer v. Slater*, 20 F.3d 1137, 1141 (11th Cir. 1994) (quotation omitted). Summary judgment is required where the non-moving party merely repeats its conclusory allegations, unsupported by evidence showing an issue for trial. *Comer v. City of Palm Bay,* 265 F.3d 1186, 1192 (11th Cir. 2001) (citation omitted).

Summary judgment will not be granted until a reasonable time has been allowed for discovery. *Comer*, 265 F.3d at 1192. Moreover, "[w]hen deciding whether summary judgment is appropriate, all evidence and reasonable factual inferences drawn therefrom are reviewed in a light most favorable to the non-moving party." *Korman v. HBC Florida, Inc.*, 182 F.3d 1291, 1293 (11th Cir. 1999). Finally, the trial court must resolve all reasonable doubts in favor of the non-moving party, although it need not resolve all doubts in a similar fashion. *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1080 (11th Cir. 1990).

**ARGUMENTS**

I.    **Defendant's Motion**

A.    **The Court Should Grant Defendant's Motion for Summary Judgment on Plaintiff's Title VII Discrimination Claims Because Plaintiff Has Failed to Produce Any Evidence That He Was Discriminated Against Because of His Race.**

1.    *Title VII is Not a Vehicle for General Judicial Review of Business Decisions.*

Section 703(a)(1) of Title VII of the Civil Rights Act of 1964, as amended, provides that "It shall be an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Title VII is not a vehicle for general judicial review of business decisions. Title VII "was not intended to 'diminish traditional management prerogatives.'" *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 259 (1981) (quoting *Steelworkers v. Weber*, 443 U.S. 193, 207 (1979)). It is simply "not the court's role to second-guess the wisdom of an employer's decisions as long as the decisions are not racially motivated." *Chapman v. AI Transport*, 229 F.3d 1012, 1030 (11th Cir. 2000) (*en banc*) (citing *Alexander v. Fulton County, Ga.*, 207 F.3d 1303, 1341 (11th Cir.2000)).

2.    *The Plaintiff is Required to Present Substantial Evidence that YMA Actually and Intentionally Discriminated Against Him on the Basis of His Race in Order to Avoid Summary Judgment.*

The plaintiff in a disparate treatment case such as this one must prove "intentional discrimination" in order to prevail. *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. at 256; *see also Reeves v. Sanderson Plumbing Prod., Inc.,* 530 U.S. 133, 153 (2000) (the "ultimate question" in every disparate treatment case "is whether the plaintiff was the victim of intentional

20

discrimination"). The Supreme Court has stated unequivocally that "[p]roof of discriminatory motive is critical" in a Title VII disparate treatment case. *Teamsters v. United States*, 431 U.S. 324, 355-36 n.15 (1997). *See also United States Postal Service v. Aikens*, 460 U.S. 711, 715 (1983); *Clark v. Huntsville City Bd. of Educ.*, 717 F.2d 525, 528-29 (11th Cir. 1983) ("discriminatory motive, purpose or animus"). The Supreme Court has also held that "discriminatory intent" in a Title VII case "means actual motive; it is not a legal presumption to be drawn from a factual showing of something less than actual motive." *Pullman-Standard v. Swint*, 456 U.S. 273, 289-90 (1982).

In *McDonnel Douglas Corp. v. Green*, 411 U.S. 792 (1973), the Supreme Court held that a plaintiff must carry the initial burden of establishing a prima facie case of discrimination. If the plaintiff succeeds in establishing a prima facie case, the defendant only has the burden of articulating or producing evidence, but not persuading, that the actions complained of were taken for a "legitimate, nondiscriminatory reason." *Reeves*, 530 U.S. at 142; *Burdine*, 450 U.S. at 253. Once the defendant articulates a "legitimate, nondiscriminatory reason" for its actions, any presumption of discrimination arising out of the prima facie case "simply drops out of the picture." *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 510-11 (1993); *see also Burdine*, 450 U.S. at 255 n.10 ("drops from the case"). This is true because once the defendant articulates a legitimate nondiscriminatory reason for its actions, the "nondiscriminatory reasons just as readily explain the difference in treatment." *Nix v. WLCY Radio*, 738 F. 2d 1181, 1186 (11th Cir. 1984).

If the defendant succeeds in rebutting plaintiff's prima facie case, the plaintiff must "prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Burdine*, 450 U.S. at 248; *see also Reeves*, 530

U.S. at 143. In order to do so, the plaintiff must present "concrete evidence in the form of specific facts which show that the defendant's proffered reason is mere pretext. Mere conclusory allegations and assertions will not suffice." *Earley v. Champion Int'l Corp.,* 907 F.2d 1077, 1081 (11th Cir. 1990).

Under the *McDonnell Douglas/Burdine* method of proof scheme, the "ultimate question " is "whether the defendant intentionally discriminated against the plaintiff," *United States Postal Service v. Aikens,* 460 U.S. at 711, and "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *St. Mary's Honor Center v. Hicks,* 509 U.S. at 507 (quoting *Burdine,* 450 U.S. at 253), unless there is direct evidence of discrimination. Only "most blatant remarks, whose intent could be nothing other than to discriminate on the basis of age [here race], . . . constitute direct evidence of discrimination." *Carter v. City of Miami,* 870 F.2d 578, 582 (11th Cir. 1989). According to defendant, plaintiff does not claim there is any such evidence in this case.

### 3.    *YMA is Entitled to Summary Judgment on Plaintiff's Claim that He Was Denied Light Duty Work Because of His Race.*

Defendant argues that plaintiff has not produced any direct evidence that YMA denied him light duty work because of his race. Defendant points to Williams's deposition testimony in which the only reason he gives that YMA's alleged denial of light duty work was because of race is the fact that he is black. YMA argues that it is entitled to summary judgment on this claim because Williams has failed to establish a prima facie case of racial discrimination based on the alleged denial of light duty work. Even if plaintiff has established a prima facie case, defendant argues, he has not shown that YMA's legitimate non-discriminatory reasons for his treatment were a pretext for intentional

discrimination.

a.    Plaintiff Has Failed to Establish a Prima Facie Case of Discrimination
      Because of YMA's Alleged Denial of Light Duty Work.

In order to establish a prima facie case of racial discrimination based on disparate treatment,

a plaintiff must show that "(1) he belongs to a racial minority; (2) he was subjected to adverse job

action; (3) his employer treated similarly situated employees outside his classification more

favorably; and (4) he was qualified to do the job." *Holifield v. Reno,* 115 F.3d 1555, 1561-62 (11th

Cir. 1997); *Knight v. Baptist Hosp. of Miami, Inc.,* 330 F.3d 1313, 1316 (11th Cir. 2003). Defendant

argues that while plaintiff belongs to a racial minority, he has not established any of the other three

elements.

*No adverse job action.* Defendant maintains that plaintiff has failed to show that he was

subjected to an adverse job action because of YMA's alleged denial of light duty work. Defendant

claims that plaintiff's testimony admitting that he was on light duty at YMA for two to four months

in 2003 directly contradicts the allegations in his complaint that he was denied such work.

According to defendant, after plaintiff first submitted a doctor's note restricting him to light duties,

he was assigned duties consistent with his doctor's restrictions.   Defendant maintains that the fuel

tank band machine does not require use of thumbs or more than five pounds of lifting, and, thus,

defendant's continued assignment of plaintiff to that machine was within his doctor's restrictions

and constituted light duty work. Defendant further alleges that after plaintiff's production continued

to fall short on the fuel tank band, Assistant Production Manager Charlebois assigned plaintiff to

other light duty work, such as general cleaning, sedentary clipping hoses, and sweeping the floor

with a push broom and a mechanical sweeper. When plaintiff informed Charlebois that the cleaning

23

and clipping hoses continued to hurt his thumb, Charlebois assigned him to sweeping duties only. Plaintiff then left work for surgery. Defendant asserts that after his return to work, plaintiff continued performing light duty work of sweeping and operating a process with foot pedals.

Additionally, defendant argues that YMA was not even required to provide plaintiff with light duty work, but went to great difficulty to provide such work, even when such work contributed little value to the company and did not justify plaintiff's wages. Defendant points out that while plaintiff "testified that he felt discriminated against, his opinion, without more, is not enough to establish a prima facie case of race discrimination." *Holifield v. Reno*, 115 F.3d 1555, 1564 (11th Cir. 1997).

*No More Favorable Similarly Situated Treatment.* Defendant argues that plaintiff has failed to present evidence that he was denied light duty work within his restrictions which he was qualified to perform. The only white employee who plaintiff alleges received more favorable treatment with regard to light duty work is Edmondson, who was allowed to perform sitting-only light duty work, while plaintiff was required to perform sweeping and other non-sedentary work. Defendant argues that Edmondson and plaintiff are not similarly situated. Defendant claims that Edmondson was assigned data-entry work in the quality assurance department because she had seven years of computer experience. However, defendant alleges, plaintiff had no computer skills according to his records and his statements to management. Therefore, defendant asserts, plaintiff was not qualified to do the same sedentary work that was assigned to Edmondson. Before complaining that such work hurt his thumb, plaintiff did receive a sedentary work assignment of clipping hoses, which, according to defendant, was the only available sedentary assignment for which he was qualified. Defendant argues that YMA management made the same attempt to find light duty work that would

fit within plaintiff's restrictions as it made for Edmondson.  Defendant also points out that plaintiff

has failed to demonstrate that data entry work such as Edmondson performed was available when

he was on light duty.

Additionally, defendant draws attention to the fact that Edmondson worked only 30 days on

light duty and then she was sent home because there was no other available light duty work.

Plaintiff, on the other hand, was on light duty work for two to four months, receiving more light-

duty work at full-pay than Edmondson.  According to defendant, when as in this case "a plaintiff

fails to show the existence of a similarly situated employee, summary judgment is appropriate where

no other evidence of discrimination is present."  *Holifield*, 115 F.3d at 1562.

> b.  Plaintiff Has Failed to Produce Any Evidence that YMA's Legitimate
>
> Nondiscriminatory Reasons for Its Alleged Failure to Provide Plaintiff with
>
> Light Duty Work Are a Pretext for Intentional Discrimination.

Defendant argues that, even if plaintiff has established a prima facie case of discrimination

for denial of light duty work, YMA should be awarded a summary judgment because it has

articulated legitimate, nondiscriminatory reasons for any denial of light duty work.  Plaintiff,

defendant maintains, has completely failed to produce any evidence that defendant's reasons are a

mere pretext or mask for intentional discrimination.  Defendant states that it attempted to assign

plaintiff any available light duty work that was consistent with his doctor's restrictions, such as

operating the fuel tank band prior to plaintiff's surgery.  According to defendant, even if operation

of the fuel tank band was not consistent with his doctor's restrictions, there is no evidence that YMA

did not genuinely believe that the work it assigned was within the restrictions.  Defendant also

asserts that even if plaintiff could establish that YMA denied him the opportunity to perform the

sedentary light duty work performed by Edmondson, plaintiff cannot demonstrate that YMA did not believe that he was unqualified to perform such work or that it was available for him to perform while he was on light duty.

Defendant contends that plaintiff has failed to meet his burden of producing "significant probative evidence" of intentional discrimination based on race for the alleged denial of light duty work. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  It is defendant's position that there is a complete "absence of evidence pointing to race as the explanation for the employer's conduct." *Nix v. WLCY Radio,* 738 F.2d 1181, 1187 (11th Cir. 1984).

**4.**      ***YMA Is Entitled to Summary Judgment on Plaintiff's Claim that He Was Denied the Opportunity to Work Overtime Because of His Race.***

      a.      Plaintiff Has Failed to Establish a Prima Facie Case of Discrimination on His Claim that YMA Denied Him the Opportunity to Work Overtime.

In order to establish a prima facie case of discrimination in the payment of compensation under Title VII, the plaintiff must prove that he or she received less than the pay received by a similarly situated employee outside of the protected class because of "intentional discrimination." *Meeks v. Computer Assoc. Int'l,* 15 F.3d 1013, 1019 (11th Cir. 1994).  Defendant contends that plaintiff has failed to establish a prima facie case on his overtime claim because he has not produced any evidence that similarly situated white employees were treated more favorably. *See Holifield*, 115 F.3d at 1561-62.  Plaintiff asserts that, in June 2003, Patterson and other white associates were treated more favorably than he was regarding overtime work at YMA.  However, defendant claims that YMA associates on light duty do not work overtime except in unusual circumstances and that plaintiff was on light duty restrictions for June 2003 until "at least . . . October 2003."

26

Defendant contends that plaintiff's production decreased when his thumb was injured and that Patterson, who began work as a temporary employee on June 10, 2003, filled in on the fuel tank band to catch production up to schedule. According to defendant, Patterson worked no overtime for the week ending June 15, 2003, and she worked 9.43 overtime hours for the week ending June 22, 2003. In its brief in support of its motion for summary judgment, defendant argues:

> "Having an injured employee with decreased production perform overtime work to make up for the drop in production does not make sense, because the injured employee would need to work more overtime than the noninured (*sic*) employee to make up the deficit in production. Paying time-and-a-half overtime pay to an employee restricted to sweeping floors or to an employee performing his regular job at a decreased rate is not a good business strategy and is not required by law."

Defendant maintains plaintiff has not demonstrated that any similarly situated white employees on light duty were treated more favorably with regard to overtime and, therefore, has not established a prima facie case of discrimination. According to defendant, plaintiff has failed to identify any other associates who worked overtime while they were on light duty. Defendant also claims that white associates Edmondson and Patterson testified that they were not permitted or required to work overtime when they were on light duty.[38]

      b.    <u>Plaintiff Has Failed to Produce Any Evidence that YMA's Legitimate, Nondiscriminatory Reasons for Alleged Denial of Overtime Work Were a Pretext for Intentional Discrimination.</u>

---

[38] The court notes, however, Edmondson testified that she worked 30 minutes of overtime while on light duty. (Edmondson aff., ¶ 9).

Defendant argues that even if plaintiff has established a prima facie case of discrimination for denial of opportunity to work overtime, YMA is still entitled to summary judgment because it has articulated legitimate, nondiscriminatory reasons for any denial of overtime work and plaintiff has completely failed to produce any evidence that defendant's reasons are a mere pretext or mask for intentional discrimination. According to defendant, plaintiff was on light duty restriction when he claims he was denied overtime and associates on such restrictions at YMA do not work overtime, except in unusual circumstances. Defendant asserts that, when needed on a particular process, overtime is given to the associate performing the process when a shift ends, so long as that associate is willing and capable of performing the overtime work. A light duty employee, defendant claims, is not capable of performing the work to a sufficient degree and therefore is not allowed the overtime. Defendant states that the only reason that plaintiff has offered for why he believes the denial of opportunity to work overtime was on the basis of race is his conclusory statement that he is black.

Defendant contends that black and white employees at YMA are awarded overtime on an equal basis, and points out that despite his injuries plaintiff worked 205.75 hours of overtime during 2003, an amount that compares favorably with the overtime hours of white YMA employees, such as Hyatt (166 hours), McClain (312.24 hours), Mayo (285.17 hours), and Hardy (273.67 hours). Additionally, to rebut plaintiff's claim of pretext, defendant asserts that overtime hours are awarded just as often to other black employees, such as Kelley (260.38 hours) , Looney (289.41 hours), and Sutton (378.61 hours). Finally defendant argues that summary judgment on plaintiff's denial of overtime claims is appropriate because plaintiff has failed to "put on sufficient evidence to allow a fact finder to disbelieve an employer's proffered explanation for its actions." *Combs v. Plantation*

*Patterns*, 106 F.3d 1519, 1532 (11th Cir. 1997).

> **5.** ***YMA Is Entitled to Summary Judgment on Plaintiff's Claim that He was Denied
> a "Promotion" to a Quality Assurance Position on the Basis of His Race.***
>
> > a.  Plaintiff Has Failed to Establish a Prima Facie Case of Discrimination
> > Because of YMA's Failure to Promote Him to a Quality Assurance Position.

Plaintiff claims YMA racially discriminated against him when it denied him a quality assurance position that became available in May 2003. In order to establish a prima facie case of discrimination in promotions, the plaintiff must prove: (1) he is a member of a protected class; (2) he was qualified for and applied for the promotion; (3) he was rejected despite his qualifications; and (4) other equally or less qualified employees who were not members of the protected class were promoted. *Lee v. GTE Florida, Inc.,* 226 F.3d 1249, 1253 (11th Cir. 2000), *cert. denied*, 532 U.S. 958 (2001); *Wu v. Thomas,* 847 F.2d 1480, 1483 (11th Cir. 1988), *cert. denied*, 490 U.S. 1006 (1989). According to defendant, plaintiff has not established that he was eligible under the transfer policy to apply for the quality assurance position in May 2003. Additionally, defendant asserts that plaintiff has not established that similarly situated white associates who did not satisfy the transfer policy were treated more favorably, and has therefore failed to establish a prima facie case with respect to his promotion claim.

*Not Qualified to Apply.* Defendant claims plaintiff has not shown that he was eligible to apply for the quality assurance position. Defendant maintains that a move from production associate to quality assurance associate was a lateral transfer, subject to the transfer policy in YMA's associate handbook. Defendant claims that at the time the disputed position became open, the transfer policy

required 12 months of company service before an employee could be transferred.[39]  Because plaintiff only had four months of company service in May 2003, defendant argues, he did not qualify for a transfer into the quality assurance position.  Therefore, defendant contends, plaintiff has not satisfied the second element from *Lee, supra.*

     *Same Treatment for Similarly Situated Associates.*  According to defendant, plaintiff has also failed to produce any evidence that similarly situated white associates who did not satisfy the transfer policy were treated more favorably.  Plaintiff claims both Jeremy Beard and Don Whaley were allowed voluntary transfers without satisfying the requirements of the transfer policy.  However, defendant asserts, the transfer policy did not apply to either Beard's or Whaley's situations.  Beard, according to defendant, was promoted from production associate to production team leader in November 2002.  Defendant maintains that the transfer policy does not apply to promotions within the same department.  Whaley was allowed to take the quality assurance test for the disputed position, whereas plaintiff was not.  Defendant contends that at the time he took the test, Whaley was a temporary associate working at YMA through a temporary employment agency and therefore the transfer policy did not apply to him.  After taking the test, defendant states, Whaley accepted a permanent production associate position with YMA.  According to defendant, by taking the production associate position, Whaley became disqualified for the quality assurance position because giving him the position would cause a transfer in violation of the transfer policy.  Therefore, defendant asserts, Whaley was not offered the quality assurance position even though his test results qualified him for the position.  Given all this, defendant claims plaintiff has failed to satisfy the

---

[39] According to defendant, the transfer policy was changed to require only 6 months of company service beginning in January 2004.

fourth element of *Lee, supra.*

      b.    <u>Plaintiff Has Failed to Produce Any Evidence that YMA's Legitimate</u>
<u>Nondiscriminatory Reasons for Its Failure to Promote Roy Williams Were</u>
<u>a Pretext for Intentional Discrimination.</u>

Defendant asserts that even if plaintiff has proven his prima facie case of discrimination in promotions, YMA should still be granted summary judgment because it has articulated legitimate, nondiscriminatory reasons for not promoting plaintiff and plaintiff has failed to produce any evidence that defendant's reasons were a mere pretext for intentional discrimination.

Once the defendant articulates a "legitimate, nondiscriminatory reason" for its actions, any presumption of discrimination arising out of the prima facie case "simply drops out of the picture." *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 510-11 (1993). *See also Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 256 (1981) ("drops from the case"). "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Hicks,* 509 U.S. at 507 (*quoting Burdine,* 450 U.S. at 253). The plaintiff has the burden of persuading the court that "the defendant acted with a discriminatory purpose." *Clark v. Huntsville Bd. of Educ.,* 717 F.2d 525, 529 n.5 (11th Cir. 1983). Defendant argues that plaintiff has failed to produce any evidence of a discriminatory purpose on the part of YMA and that, therefore, defendant should be granted summary judgment.

**B.**    **The Court Should Grant Defendant's Motion for Summary Judgment on Plaintiff's Title VII Harassment Claims Because He Is Not Entitled to Recover on That Claim as a Matter of Law.**

In order to establish a prima facie case of hostile environment racial harassment under Title

VII, a plaintiff must demonstrate: "(1) plaintiff belongs to a protected group; (2) plaintiff has been subjected to unwelcome harassment; (3) the harassment was based on plaintiff's race; (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of plaintiff's employment and to create a discriminatorily abusive working environment; and (5) a basis for holding the employer liable." *Chambers v. Walt Disney World Co.*, 132 F. Supp. 2d 1356, 1370 (M.D. Fla. 2001) (citing *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir. 1999)). Defendant argues plaintiff has not established a prima facie case because (1) he has not shown that Don Whaley's alleged uses of the slur "nigger" were sufficiently severe or pervasive to alter the terms and conditions of plaintiff's employment; (2) he has not shown that it created a discriminatorily abusive working environment; and (3) he has not demonstrated a basis for holding YMA liable for Whaley's alleged comments.

### 1.    *Plaintiff Has Not Established a Hostile Environment Based on Don Whaley's Alleged Use of Racial Slurs.*

Defendant asserts that Whaley's alleged used of a racial slur on three or four occasions is not sufficiently severe or pervasive to constitute a hostile work environment under Title VII.   Four factors are relevant in determining whether conduct is sufficiently severe and pervasive from an objective standpoint to alter an employee's terms or conditions or employment: "'(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance.'" *Chambers*, 132 F.Supp. 2d at 1370 (*quoting Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir. 1999)); *Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 584 (11th Cir. 2000).

Defendant argues that the three or four alleged uses of the slur, "nigger," in May or June 2003 by Whaley to plaintiff did not create severe and pervasive harassment that altered the terms and conditions of plaintiff's employment.  Defendant claims that the alleged use of the slur by Whaley was not frequent or severe, arguing that two or three of the four uses allegedly happened in one day.  Defendant points out that only on one occasion did anyone else allegedly hear the slur, and claims that the uses of the slur were not physically threatening.  According to defendant, despite Whaley's alleged uses of the slur, plaintiff continued to call Whaley to bring him equipment by the intercom.[40]  Defendant maintains that if the alleged harassment was so severe and pervasive as to alter the terms and conditions of plaintiff's employment, he would not have continued to voluntarily bring about the encounters with Whaley that had resulted in the earlier use of the slur.  A "'mere utterance of an ... epithet which engenders offensive feelings' does not adversely affect a term or condition of employment."  *Bivins v. Jeffers Vet Supply*, 873 F. Supp. 1500 (M.D. Ala. 1994) (quoting *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21 (1993)).

The Eleventh Circuit has held that "racial slurs must be so 'commonplace, overt and denigrating that they create an atmosphere charged with racial hostility.'" *Dixon v. Young*, No. 3:98-CV-167-JTC, 2000 WL 33224515, *6 (Sept. 21, 2000) (quoting *Edwards v. Wallace Community College*, 49 F.3d 1517, 1521 (11th Cir. 1993)); *see also Bivins*, 873 F. Supp. at 1508-09 (finding that despite reported use of the slur, "nigger," in the place of employment, the use did not affect a term and condition of the plaintiff's employment); *Smith v. Beverly Health & Rehabilitation Servs., Inc.,* 978 F. Supp. 1116, 1121-22 (N.D. Ga. 1997) (granting defendant's summary judgment motion on hostile work environment claim despite repeated use by supervisor of slur, "nigger," and other racial

---

[40] The court notes that defendant does not give a cite to the record for this fact.

comments); *Mitchell v. Carrier Corp.,* 954 F. Supp. 1568, 1577-78 (M.D. Ga. 1995), *aff'd* 108 F.3d 343 (11th Cir. 1997) (finding as insufficiently severe plaintiff's allegations that "Nigger Ape" and "Nigger" were written on company bathroom walls, "KKK" initials were written on travel packets, and racist statements were made by co-worker). Defendant asserts there is no such evidence here.

According to defendant, plaintiff has not alleged that the use of the racial slurs were so commonplace, overt, and denigrating to create an atmosphere charged with racial hostility. Defendant also states plaintiff has not produced any evidence that the workplace was "permeated with discriminatory intimidation, ridicule, and insult" as required for a hostile environment claim. *Harris,* 510 U.S. at 21. It is defendant's position that plaintiff has not presented any evidence, other than his own conclusory allegations, that anyone else heard any of the slurs. Defendant also maintains that plaintiff has failed to produce any evidence that his employment was adversely affected by the use of the slurs. Defendant points out that plaintiff never complained about any of the remarks, despite being aware of the harassment policy in the handbook and the requirement to report incidents of harassment. Defendant argues that because plaintiff has not produced any evidence of sufficiently severe and pervasive conduct to alter the terms and conditions of his employment, he has not established a prima facie case of hostile environment racial harassment. *Gupta v. Florida Bd. of Regents,* 212 F.3d 571, 583-84 (11th Cir. 2000); *Chambers,* 132 F.Supp.2d at 1370.

### 2. *Plaintiff Has Not Established That YMA Had Actual or Constructive Notice of Racial Harassment and Failed to Take Remedial Action.*

In order to establish a prima facie case for a hostile work environment claim, "the plaintiff must demonstrate a basis for holding the employer liable for the harassment. . . . Employer liability

in a case involving sexual [here racial] harassment by a co-worker exists when the employer knew (actual notice) or should have known (constructive notice) of the harassment and failed to take remedial action." *Breda v. Wolf Camera & Video*, 222 F.3d 886, 889 (11th Cir. 2000). An employer "is insulated from liability under Title VII for a hostile environment sexual [here racial] harassment claim premised on constructive knowledge of the harassment when the employer has adopted an anti-discrimination policy that is comprehensive, well-known to employees, vigorously enforced, and provides alternate avenues of redress" *Farley v. American Cast Iron Pipe Co.,* 115 F.3d 1548, 1554 (11th Cir. 1997). Defendant claims YMA is insulated from liability in this case because it had no actual knowledge of harassment and had in effect a valid harassment policy that was vigorously enforced.

YMA's Harassment Policy states:

> All associates have the right to work in an environment free from harassment. It is our intent to maintain an enjoyable and comfortable working environment for everyone. YMA will not tolerate the harassment of its associates, whether by other associates or by non-associates. It is your responsibility to report any form of harassment that you experience or witness immediately to your supervisor or directly to the Associate Services Coordinator or the Administrative Manager. YMA will take appropriate and effective action in a timely and confidential manner. . . . If YMA determines that an associate has engaged in harassment, has failed to report witnessed harassment, or has failed to cooperate fully with the investigation of harassment, YMA will impose disciplinary action up to and including discharge. .
> . .

Defendant argues that, although aware of this policy and its requirements, Williams failed to report any of the racial slurs allegedly made by Whaley. Defendant maintains that if these slurs occurred and plaintiff deemed them harassment, he violated the policy by failing to report them.

Defendant claims YMA's harassment policy is vigorously enforced. According to defendant, plaintiff has failed to identify any incidents when an associate has made a complaint pursuant to the policy and the complaint has not been fully investigated in accordance with the policy. Defendant points out that a coordinator has been terminated pursuant to the policy for his use of the slur, "nigger," in the workplace. Another black production associate testified that YMA responded immediately and remedied the situation following his report of a single occasion of the use of the "N" word by a white employee. Defendant asserts that plaintiff's failure to report the alleged slurs unreasonably prevented the investigation of their occurrence. "[O]nce an employer has promulgated an effective anti-harassment policy and disseminated that policy and associated procedures to its employees, then 'it is incumbent upon the employees to utilize the procedural mechanisms established by the company specifically to address problems and grievances.'" *Madray v. Publix Supermarket, Inc.*, 208 F.3d 1290, 1300 (11th Cir. 2000) (quoting *Farley,* 115 F3d at 1554). Defendant argues that YMA cannot be deemed to have constructive knowledge of Whaley's remarks, because it has a valid, comprehensive harassment policy, adequately disseminated and vigorously enforced, requiring reporting of harassment, which plaintiff failed to utilize. *Farley*, 115 F.3d at 1554-55 (Because of plaintiff's "failure to avail herself of the grievance procedure established and implemented by [defendant], knowledge of [the harassment] cannot be imputed to [defendant] under a theory of constructive knowledge").

Finally, defendant argues YMA did not have actual notice of the alleged racial slurs.

Plaintiff has admitted that management had no knowledge of all but one of the three or four slurs. Plaintiff did not report the slur allegedly brought to YMA's attention, but claims that Tammy Hoskins and Lindsay Davenport heard the incident and reported the slur to Production Coordinator Scott. Williams was not present when Hoskins and Davenport allegedly reported the harassment and did not hear them report it. Hoskins denies ever hearing Whaley use the slur and denies reporting it to Scott. Defendant claims YMA has never employed anyone named "Lindsay Davenport." Scott testified no one ever reported to him any racial harassment or use of the slur, "nigger," to plaintiff or any harassment or slur usage by Whaley. Defendant argues plaintiff has failed to offer any admissible evidence that YMA had actual knowledge of Whaley's alleged harassment, and, thus, YMA cannot be liable for the alleged remarks.

**C.**     **The Court Should Grant Defendant's Motion for Summary Judgment on Plaintiff's §**
       **1981 Claims Because He Failed to Produce Any Evidence That He Was Discriminated**
       **Against Because of His Race.**

Defendant argues plaintiff cannot recover on his § 1981 claims for the same reasons he cannot recover on his Title VII claims. Section 1981, like Title VII, requires the plaintiff to prove "intentional discrimination" based on race in order to prevail. *Standard v. A.B.E.L. Serv., Inc.,* 161 F.3d 1318, 1330 (11th Cir. 1998); *Brown v. American Honda Motor Co.,* 939 F.2d 946, 953 (11th Cir. 1991), *cert denied,* 502 U.S. 1058 (1992); *Price v. Lockheed Space Operations Co.,* 856 F.2d 1503, 1507 (11th Cir. 1998). The *McDonnel Douglas/Burdine* method of proof scheme also applies to § 1981 cases. *Standard v. A.B.E.L. Serv., Inc.,* 161 F.3d at 1330. Defendant asserts that plaintiff cannot prevail under § 1981 because he cannot prevail under Title VII.

37

**II.    Defendant's Reply to Plaintiff's Response to Motion for Summary Judgment**[41]

**A.    Despite Plaintiff's Assertions in His Affidavit, He Cannot Establish a Prima Facie Case of Racial Discrimination or Show That YMA's Legitimate, Non-discriminatory Reasons Relating to His Light Duty Assignment From May 28, 2003 to July 8, 2003 Were Pretextual.**

**1.    *Plaintiff's Affidavit Contradicts His Prior Deposition Testimony and Should Be Stricken.***

Defendant argues that plaintiff's affidavit should be stricken to the extent that it contradicts his deposition testimony. "When a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony." *Van T. Junkins, Inc. v. U.S. Industries*, 736 F.2d 656, 657 (11th Cir. 1984). Defendant reiterates its objection to plaintiff's affidavit testimony that Shannon was not his supervisor.[42]

**2.    *Plaintiff Has Not Established a Prima Facie Case of Race Discrimination Because of YMA's Light Duty Assignment.***

*Plaintiff Suffered No Adverse Job Action.  He Was Not Denied Light Duty.* Defendant highlights Shannon's testimony that he received a doctor's note restricting plaintiff's work dated June 2, 2003, and his testimony that he did not have knowledge of plaintiff's light duty restrictions

---

[41] Plaintiff replied to defendant's motion for summary judgment by submitting a affidavit by Williams. The contents of that affidavit have been discussed in the facts section of this opinion.

[42] *See supra note 4.*

prior to receiving that note. Defendant also notes that a subsequent doctor's note dated June 19, 2003 did not prohibit plaintiff from using his left hand, but only required no forceful pushing with plaintiff's left thumb. Additionally, defendant points to evidence that plaintiff could operate his welding machine, the fuel tank band, without use of his left thumb, and that Shannon instructed him on using the machine without his thumbs. Finally, defendant asserts that, in performing the fuel tank band process, plaintiff was performing a task within his doctor's restrictions. Therefore, defendant argues, plaintiff has not established that he suffered an adverse job action because of the denial of light duty during this time period.

*Plaintiff Has Not Shown That Similarly Situated White Individuals Received More Favorable Treatment.* Defendant asserts plaintiff has not established a prima facie case because he has not shown evidence of any white employees who were not required to perform their process while on doctor's restrictions when the process could be performed within the restrictions set by his or her doctor.

3. *Plaintiff Has Not Established That YMA's Legitimate, Non-discriminatory Reasons for His Light Duty Work Assignment Were Pretextual.*

Defendant reiterates its argument that plaintiff cannot prevail on his "denial of light duty" discrimination claim because he has not shown that YMA's reason for its light duty assignment was false, and he has not shown that race was the real reason for the light duty assignment. "Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason." *Chapman v. AI Transport*, 229 F.3d 1012, 1030 (11th Cir. 2000). Defendant asserts that, even if YMA was incorrect or mistaken in determining that the work

39

assigned to plaintiff was within his medical restrictions, plaintiff has not established that race was the real reason, and, thus, his claim must fail. Defendant points out that plaintiff was given light duty work 120 days in 2003 and that he was off work for injury 26 days. Furthermore, defendant highlights Shannon's and Scott's affidavit testimony stating that YMA has granted light duty work to all YMA employees regardless of their race.

**B.**      **Despite Plaintiff's Assertions in His Affidavit, He Has Failed to Establish a Prima Facie Case of Racial Discrimination or Show That YMA's Legitimate, Nondiscriminatory Reasons for His Light Duty Work Assignment from August 21, 2003 Through December 31, 2003 Were Pretextual.**

Although plaintiff testified that he was denied the opportunity to perform sedentary light duty work following his return from surgery in August 2003, defendant points to Plant Manager Carpenter's affidavit testimony that "No one at YMA was aware that Mr. Williams was under doctor's restrictions limiting him to sedentary work because of his injured left thumb." Carpenter also testified that even if plaintiff had presented YMA with a doctor's restriction limiting him to sedentary work, the limitation would have been questioned because associates with injured thumbs are ordinarily not limited to sedentary work. When submitted doctors restrictions are questioned, Carpenter stated, YMA calls the associate's doctor and informs the doctor of the specific job duties the associate is to perform to get the restrictions modified. Carpenter asserted that no one called plaintiff's doctor about the sedentary restriction because no one at YMA knew of the restriction. It is defendant's position that plaintiff has not established that he was discriminated against on the basis of race in the denial of light duty work, because (1) he was not denied available light duty work, (2) he has not shown that he was treated differently than a similarly situated white employee,

40

and (3) defendant's legitimate, non-discriminatory reasons for light duty assignment were not pretextual.

1. ***Plaintiff Has Not Established a Prima Facie Case of Race Discrimination Because He Suffered No Adverse Job Action in the Alleged Denial of Sedentary Light Duty Work.***

Defendant argues that, even if plaintiff had submitted a doctor's note restricting him to sedentary work, defendant could not have accommodated those restrictions. Defendant points to Carpenter's testimony that through the end of December 2003 there was no sedentary work available which plaintiff could have performed. Plaintiff's supervisors attempted to assign him to perform the sedentary work of clipping hoses, but he could not do it because of his injured thumb. Defendant also points out that plaintiff was assigned to work on a mechanical sweeper, which it claims was sedentary work, but the mechanical sweeper broke after a few days. According to defendant, if no sedentary duties were available, plaintiff did not suffer an adverse employment action by YMA continuing to work him rather than sending him home to receive temporary-total disability worker's compensation benefits. Carpenter testified that company policy was to attempt to find available light duty work for injured associates so that the associates could continue receiving their full pay while recovering instead of only the 2/3 of their regular pay they would receive from workers compensation.

Defendant restates its argument for striking as conclusory plaintiff's affidavit testimony that "[i]f no sedentary work was available, I should have been sent home to receive temporary-total disability workers compensation benefits." Additionally, defendant asserts that plaintiff's claim in this action is that he was not awarded light duty work because of race, and that plaintiff has never

previously claimed that he should have been sent home from work. As it was not previously raised, defendant concludes that this claim cannot now be considered.[43]

2. ***Plaintiff Has Note Established a Prima Facie Case of Race Discrimination Because He Has Not Shown that Similarly Situated White Individuals Received More favorable Treatment.***

The only individual plaintiff alleges received better treatment than he did with regard to light duty is Edmondson, who was allowed to do computer work while recovering from an injury. Defendant asserts that Edmondson was not treated more favorably than plaintiff, because the work performed by Edmondson was not available until January 2004, when plaintiff does not claim he was restricted to sedentary duties.[44] Plaintiff's affidavit testimony indicates that he was no longer restricted to sedentary work after December 5, 2003. Defendant points out that Edmondson was not assigned the computer work until January 2004 after she returned from surgery.

Defendant further argues that, even if the computer work had been available when plaintiff was allegedly on sedentary work restriction, plaintiff has shown no evidence that he was qualified to do such work. According to defendant, Edmondson was assigned the computer work because she had a computer background, of which YMA was aware. Plaintiff's managers, Shannon and Charlebois testified that they were not aware that he had any computer experience. Plaintiff testified

---

[43] In support of this argument, defendant cites to *Sanchez v. Standard Brands, Inc.*, 431 F.2d 455, 466 (5th Cir. 1970). In that case the Fifth Circuit adopted the rule from *King v. Georgia Power Co.*, 295 F.Supp. 943 (N.D. Ga. 1968). The *Sanchez* court stated, "the 'scope' of the judicial complaint is limited to the 'scope' of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." 431 F.2d at 466.

[44] Defendant notes that Edmondson returned to work after her surgery on January 12, 2004. Other than this fact, defendant does not cite to any evidence in the record that shows the computer work was not available until January 2004.

42

that he has computer skills which he had learned in college and while in the U.S. Army. Defendant

points out that plaintiff worked in the Army from 1966 to 1969. Additionally, defendant highlights

plaintiff's deposition testimony that he completed 3 years of college prior to being drafted into the

Army. Accordingly, defendant argues that plaintiff's alleged computer experience prior to 1969 has

no relevance to the computer experience required for the quality assurance work performed by

Edmondson in 2004.[45]

    **3.**    *Plaintiff Has Not Established That YMA's Legitimate, Non-discriminatory*
    *Reasons for His Light Duty Work Assignment Were Pretextual.*

Defendant claims that no one at YMA knew of plaintiff's sedentary restriction and that there

was no available sedentary work for which plaintiff was qualified that did not require the use of his

thumb. Defendant maintains that plaintiff has not demonstrated that defendant's reasons for

allegedly denying him sedentary work following his return from surgery on his thumb were false

and a pretext for racial discrimination. "Once defendant states a legitimate reason, plaintiff must

show that defendant's articulated reason is merely a pretext and that defendant's true reason for

discharging plaintiff was discrimination." *Howard v. BP Oil Co.*, 32 F.3d 520, 524-25 (11th Cir.

1994). Defendant points out that plaintiff received more light duty work at full pay, 120 days in

2003, than did Edmondson, who only received 30 days before being sent home. Defendant also

points to Charlebois's affidavit testimony that he granted light duty work to all YMA associates

regardless of race and that he assigned light duty work to several African American employees.

**C.**    **Despite Plaintiff's Assertions in His Affidavit, He Has Failed to Establish a Prima Facie**

---

[45] Defendant asks the court to take judicial notice of the fact that Microsoft Excel did not exist in 1969. Based on this fact, defendant asserts, plaintiff could not have had experience with Microsoft Excel, the program used to complete the quality assurance work.

**Case of Racial Discrimination or Show That YMA's Legitimate, Non-discriminatory Reasons for Any Denial of Overtime Pay Are Pretextual.**

1. *Plaintiff Has Not Established a Prima Facie Case of Race Discrimination Because He Has Not Shown That Similarly Situated White Individuals Received More Favorable Treatment as to Overtime Pay While on Light Duty.*

Defendant asserts that plaintiff has failed to show that similarly situated white employees who were on light duty received overtime hours except in unusual circumstances. Although plaintiff testified the Edmondson received overtime work while on light duty, Edmondson testified that she only worked 30 minutes of overtime as make-up work. Plaintiff testified that, in June 2003, Patterson, a white employee was allowed to work overtime instead of him. However, defendant asserts that at that time Patterson was not on light duty, and plaintiff does not claim that she was. Patterson testified that she was not aware of any associates who had worked overtime for YMA while on light duty. She also stated that she was not allowed to work overtime when she was on light duty.

2. *Plaintiff Has Not Established That YMA's Legitimate, Non-discriminatory Reasons for Plaintiff's Failure to Work Overtime on Light Duty Were Pretextual.*

Defendant maintains that plaintiff has not shown any reason to believe that plaintiff's being on light duty was not the reason he did not work overtime or that his race was the real reason he was denied overtime hours. Defendant points out that prior to going on light duty, plaintiff frequently worked overtime. Associate Service Manager Wojciechowski testified that associates of all races at YMA have equal opportunity to perform overtime work when it is available and in accordance with company policy. Defendant also highlights the fact that the overtime hours of African

44

American employees such as Sutton and Kelley are comparable to those of many white employees such as Hyatt, McClain. Mayo and Hardy.  Furthermore, defendant draws attention to a chart of overtime hours worked by YMA associates which indicates that African American employees work overtime at an approximately equal rate as white employees.

Defendant claims plaintiff does not show pretext by his testimony that he was still performing his process and that his productivity was not low in June 2003 while on light duty restriction.  Defendant claims plaintiff's affidavit testimony contradicts his previous deposition testimony that he was being counseled about his low productivity while performing his process on light duty in June 2003.

**D.**  **Despite Plaintiff's Assertions in His Affidavit, He Has Failed to Establish a Prima Facie Case of Racial Discrimination for the Failure to "Promote" Him to a QA Position in May 2003.**

**1.**  *Plaintiff Has Not Established a Prima Facie Case of Race Discrimination Because He Has Not Shown That He Was Qualified for a Transfer to a Quality Assurance Position in May 2003.*

Defendant reasserts its argument that plaintiff was not eligible to transfer to the quality assurance position in May 2003 because he did not have 12 months of company service as required under YMA's transfer policy.

**2.**  *Plaintiff Has Not Established a Prima Facie Case of Race Discrimination Because He Has Not Shown that Similarly Situated White Employees Have Received More Favorable Treatment Under the Transfer Policy.*

According to defendant, plaintiff has failed to show that any similarly situated white

45

employees received more favorable treatment under YMA's transfer policy.  In his affidavit, plaintiff pointed out that Nina Hibbs, a white associate, transferred from production associate to QA associate in July 22, 2002, less than 12 months after her hiring date of November 12, 2001. According to defendant, Hibbs transfer occurred prior to the date that the transfer policy became effective.  Carpenter testified that YMA began operations in October 2001 and that the transfer policy was not applied until one year after that date.  Carpenter explained that the policy was not applied during this first year because none of the employees at the plant would have had 12 months experience.

In his affidavit, plaintiff also noted that Beth Hyatt began her YMA employment in the assembly department in September 2002, but had transferred to the weld department around January 2003, less than five months after her date of hire.  However, defendant asserts Hyatt's change in jobs was not an interdepartmental transfer, and thus not subject to the transfer policy.  Carpenter testified that YMA's departments are Production, Materials, Quality Assurance, TSS, and Human Resources. According to defendant, both assembly and weld are in the Production Department under one department coordinator.  Additionally, Carpenter asserted that the transfer policy does not cover transfers within a particular department such as within the Production Department.  Carpenter stated that no formal procedures exist for associates to switch jobs within the same department, and that the department coordinator has complete discretion over the assignments of jobs in his or her department and may alter these assignments on a daily basis.

Defendant again points out that Don Whaley, a white employee, was prevented from transferring from the Production Department to the Quality Assurance Department in May 2003 because he did not have a year of company service.

## CONCLUSIONS OF THE COURT

The present motion for summary judgment concerns plaintiff's claims that: (1) despite restrictions given by plaintiff's doctors, defendant racially discriminated against him by denying him light duty from May 28 to July 8, 2003 and from August 21, 2003 to December 31, 2003 while giving light duty to similarly situated white employees; (2) defendant racially discriminated against plaintiff by denying him overtime work in June 2003 while giving such work to white employees; (3) defendant racially discriminated against plaintiff by failing to promote him to a quality assurance position in May 2003 and granting the position to a less qualified white employee; and (4) defendant subjected plaintiff to racial harassment by failing to remedy harassment of plaintiff by a co-worker.

**I.      Plaintiff's Claims that Defendant Denied Him Light Duty Work.**

The court concludes that the plaintiff has not presented any evidence creating a reasonable inference that he was intentionally discriminated against based on his race under this claim. Assuming, without deciding, that plaintiff has proven a prima facie case, the court concludes that he has not ultimately proven intentional discrimination.[46]

The court first notes that the plaintiff *was* placed on light duty for a significant period in 2003 in addition to being absent from work for a period. The only suggestion of his disparate treatment is that Edmondson was allowed to work on computers for thirty days. Plaintiff's position lacks merit for several reasons:  (1) There is no evidence that computer work was available in 2003; (2) More significantly, there is no reasonable inference that plaintiff should

---

[46]   Since the plaintiff has not created a reasonable inference that similarly situated white persons were better treated, it is doubtful that he has proven a prima facie case.

have been deemed qualified to work on computers in *2003*.  His only indicated experience, expressed in a conclusory manner, is that he had worked with computers in the 1960s.  The computer claim appears to be merely an attempt to establish disparate treatment.  It should be further noted that the plaintiff received more light duty with full pay than did Edmondson; (3) The evidence establishes that a number of other African Americans were given light duty.  There is no evidence, anecdotal or otherwise, of discriminatory treatment regarding light duty.  There is only the plaintiff's conclusory allegations.

## II.    Plaintiff's Claims that Defendant Denied Him Overtime Work.

Interestingly contrasted with plaintiff's position that he was unable to perform regular work is his allegation that he should have been allowed to work overtime.  The plaintiff, notwithstanding his injury, worked more than 200 hours of overtime in 2003.  This time compares favorably with the overtime of other African American employees and white employees.  There is absolutely no reasonable inference of intentional discrimination.

## III.    Plaintiff's Claims Regarding Failure to Promote to Quality Assurance Position.

The court assumes, without deciding, that this claim involves an adverse employment action.  Apparently, there was no pay differential and, rather than a promotion, it may have been only a lateral transfer.  More significantly, the plaintiff was not eligible for the complained of transfer because he had only four months of qualifying employment at the time.  Plaintiff's purported comparisons do not relate to similarly situated employees.  Some changed positions within the same department.  Whaley, referred to by plaintiff, was not transferred.  There is no reasonable inference of intentional discrimination related to promotion.

## IV.    Plaintiff's Claim of Racial Harassment.

48

Assuming, without deciding, that plaintiff's allegations relating to Whaley are sufficient to establish that the conduct was sufficiently severe and pervasive to alter the conditions of plaintiff's employment, the court concludes that plaintiff cannot prevail against the employer because he failed to follow the established procedure for reporting such alleged violations. There is not sufficient evidence of actual or constructive notice. In another instance when such notice was given, prompt corrective action was taken.

## V.    Summary.

The court will grant the defendant's motion for summary judgment as to all the claims discussed herein above

Remarkably, plaintiff's amended complaint filed on April 21, 2004 purports to state a large number of additional claims not alluded to in the initial complaint. Plaintiff and his attorney should carefully consider which of these claims the plaintiff wishes to pursue. The motion to amend which the court granted related only to age discrimination and retaliation covered by a described "right to sue letter." Within 15 days the plaintiff will file a list of claims which he wishes to pursue which fall within the bounds of that allowed amendment and no others.

This 26 of August, 2004.

ROBERT B. PROPST
SENIOR UNITED STATES DISTRICT JUDGE